**GOETTGE, ESTATE OF, In Re**

Probate Court, Tuscarawas Co.

Decided April 2, 1940.

Fisher, Limbach, Smith & Renner, of New Philadelphia, for Theodore Goettge, plaintiff.

J. S. Hare, New Philadelphia, and John C. O'Donnell, Mansfield, for Eva Rees Goettge, defendant.

## OPINION

By LAMNECK, J.

Peter Goettge died intestate, as a result of an accident, on September 25, 1939. Thereafter, one Eva Rees Goettge representing herself to be the surviving spouse of said decedent appeared in court and was appointed administratrix of his estate. The decedent left no children, but was survived by brothers and sisters. One of the brothers instituted this action by filing a motion asking the court to vacate the appointment of Eva Rees Goettge as such administratrix on the ground that she is not the surviving spouse of the decedent. Said Eva Rees Goettge resists the motion on the ground that she and the decedent contracted a valid marriage at common law.

The first question for the court to determine in this case is whether or not Eva Rees Goettge was a competent witness. When she appeared on the stand, an objection was made that she was not a competent witness by reason of the provision of §11495 GC. Her testimony was taken but the ruling as to its competency was reserved by the court. The pertinent part of this section insofar as it relates to this case reads as follows:

"A party shall not testify when the adverse party * * * is an executor or administrator, or claims or defends as heir, grantee, assignee, devisee or legatee of a decased person."

This section is found in Chapter 3 of Division III GC relating to trial and is primarily intended to apply to cases pending in the Common Pleas Court. It likewise applies to cases in the Probate Court by virtue of §10501-22 GC, which provides that the provisions of law governing actions in the Common Pleas Court shall like-

wise apply to proceedings in the Probate Court.

This particular question, so far as the court knows, has never been definitely decided by any court in Ohio.

In **Umbenhour v Umbenhour, 12 O. C. C. (N.S.) 289**, which was a proceeding in partition, an alleged surviving common law wife was permitted to testify relative to the purported marriage, but she was not a party to the action.

In **Howard v Bank, 21 Oh Ap 74**, in which the plaintiff asked the court to determine the next of kin of a decedent, a purported common law wife of the decedent testified as to the consummation of the marriage contract, but such testimony was received **without objection.**

In **Holmes v Railroad, 28 Oh Ap 297**, it was held that "in action by wife as executrix for death of husband, for her benefit as surviving widow in which plaintiff claimed there had been common law marriage after previous divorce, excluding evidence regarding conversations between the parties tending to show agreement of marriage on ground that it would constitute personal communication between husband and wife held error, since they had been previously divorced and no common law marriage would exist until after agreement was made."

This was held to be error under §11494 GC and not under §11495 GC. Sec. 11495 GC, did not prohibit the purported wife to testify in that case since the adverse party was the railroad company.

In **Miller v Miller, 15 O. C. C. (N.S.) 481**, involving the construction of a will, brought by the fiduciary, the court held that "parties who are financially interested in the construction of a will, and whose rights will be affected by the decision of the court, are not competent to appear as witnesses," under §11495 GC.

In the case of **In re Redman, 135 Oh St 554, 14 OO 426**, involving a determination of heirship, a purported common law husband testified, and his evidence was considered by the court, but the record does not show that his competency was ever questioned or objected to.

In other states having similar statutes, there are a few cases holding that under such circumstances a purported common law wife would be entitled to testify. (Stevens v Joyal, 48 Vt. 291; Buchanan v Buchanan, 29 S. E. 608; Nolan v Doss, 31 So. 969; Rogers v McLesky, 142 So. 526).

In Mahers Estate, 71 N. E. 438 (Illinois), the court held that under a statute which provided that no party to a civil action or proceeding, or person directly interested in the agent thereof, shall be allowed to testify therein of his own motion, or in his own behalf, when any adverse party sues or defends as the executor, administrator, heir, legatee or devisee of any deceased person, a woman claiming to be the lawful wife of a decedent, was incompetent to testify to the fact of her marriage in a proceeding to determine heirship.

Many other cases hold that under the circumstances in this case and under similar statutes, a purported common law wife is incompetent to testify. (Bartel v Edmunds, 96 S. W. 535; Shorten v Judd, 42 Pac. 337; Bowman v Little, 61 Atl. 223; Crane v Stafford, 75 N. E. 424; Catlett v Chestnut, 91 A. L. R. 212; Bishop v Investment Co., Supreme Court of Missouri, 1912, A, 868).

In Brown v Brown, 115 S. W. (2d) 786, it was held, that "a woman applying for administration of estate as deceased's surviving common law wife, was not competent to testify as to agreement between her and deceased to live together as husband and wife." In this case, the court cited, Berger v Kirby, 153 S. W. 1130, and Edelstein v Brown, 100 S. W. 129.

In the new work of "Jones on Evidence," the rule is stated as follows:

"While the contrary has been held in some of the decisions, it is the majority rule that marriage or an agreement to marry, is a transaction within the meaning of the statute."

In 28 R. C. L., §101, page 514, the author makes this comment:

"It has been held in a number of cases that where a woman claims to have been the wife of a deceased person, and as such entitled to property owned by him, she is incompetent to testify to any facts tending to establish the existence of the marriage relation between her and the deceased."

This is announced as the majority rule.

In 41 A. L. R., page 1045, in the discussion of what constitutes a claim or demand against an estate under a statute disqualifying a witness, the following appears:

"Most courts in which the question has been decided have held that the term 'claim or demand', in a statute relating to the competency of interested witnesses in the prosecution of a claim or demand against an estate, refers to the assertion of any right against an estate, according to this view the words are not restricted to a money claim, but apply also to any other demand which would tend to deplete the estate."

We are inclined to the view that the purported widow is incompetent to testify as to her purported marriage, in this case. Theodore Goettge is claiming as an heir, which makes him an adverse party. To hold differently would enable any woman with whom a man has illicitly and openly lived and co-habited, both being then unmarried, to establish the fact that she is his widow, by testifying that a contract of marriage was entered into by him and herself when they were alone, in pursuance of which the cohabitation occurred, for none can deny her. This statute is intended to protect the estates of deceased persons from the assaults of strangers, for any cause, and is not confined to proceedings wherein the decision sought by the party testifying would tend to reduce or impair the estate.

Assuming, however, that the testimony of Eva Rees Goettge is competent in this case, is there sufficient evidence to establish a valid marriage at common law?

The undisputed evidence shows that the alleged widow, when quite young, married a man by the name of Thomas Thomas who died of appendicitis; that thereafter she was married to one John Rees whom she divorced in 1923 or 1924; that on January 26, 1924, she was married to the deceased and secured a divorce from him on the grounds of extreme cruelty on April 5, 1926; that in 1929 she was married to one George Beddows from whom she was divorced in Wayne County, Ohio, on September 13, 1930, although the decree was journalized by nunc pro tunc entry after the present action was started.

The alleged widow herein claims she contracted a common law marriage with the deceased on December 25, 1930 when the deceased took Christmas dinner at her home in this county. She relates the conversation as follows:

"When we were eating dinner he said, 'How glad I am to be here eating dinner with you.' and I said, 'I am glad of that Pete.' Then mother and father went over to the other house and my son, John, and Ruth went in the other room and Pete went along and came back with a box and said, 'Here is a Christmas present for you.' When I opened it, it was a lovely bathrobe. I said, 'How sweet of you.' and he said, 'Do you love me?' I said, 'I do,' and he said, 'Would you be my wife and forget all the past?' and he says, 'You know we were married once Eva and lived together as man and wife,' and I says, 'Pete, we must have an agreement with our children,' and he said, 'Well, that will be all right. I'll tell them and we will have an agreement. I will tell the children I am taking their mother for my wife and forever,' and he kissed me and he says, 'I know we will all get along nice together.' Now, that's as near as I can tell it."

There was no one present when this conversation took place. She testifies that following this conversation, the deceased called her son and daughter

by her second husband, and stated to them. "I am going to take your mother for my wife and we will be man and wife forever."

Ruth Hoban, the daughter, testified that the deceased said, "From this day on your mother and I are living as man and wife and I want you children to respect us as that."

John Rees, the son, testified that the deceased expressed himself as follows: "He called us in and said he was going to take my mother as his wife from then on and I should respect him as my father."

Several neighbors and business men testified that they knew the alleged widow as the decedent's wife and several other persons testified that the deceased had been introduced to them as the husband of the alleged widow.

There is no dispute as to the fact that the deceased spent most of his time at the residence of his alleged widow, after her divorce from George Beddow, when he was not working, and was staying there when he was killed.

Income tax returns of the deceased, filed with the state of West Virginia for the years 1935, 1936, 1937 and 1938, were introduced in evidence and in all of those returns he claimed the exemption of a married person living with his wife. In the 1935 return, he gave his address at Weirton, West Virginia; in the 1936 return as 1312 N. Wooster Avenue, Dover, Ohio, which is in this county; in the 1937 return as Weirton, West Virginia; and in 1938 as Weirton, West Virginia. During this entire time, his alleged widow's legal residence was R. D. 1, Strasburg, Ohio, in this county.

In the Federal Income Tax returns, which were introduced in evidence for the years 1934 to 1938, inclusive, he likewise claimed exemption as a married man. In the 1934 Federal return, he gave his address as Hollidays Cove, West Virginia; in the 1935 return, as N. Wooster Avenue, Dover, Ohio; in the 1936 return, as 1312 N. Wooster Avenue, Dover, Ohio; in the 1937 return, as Weirton, West Virginia; and in the 1938 return, as Weirton, West Virginia.

Seven letters which the deceased wrote from Weirton, West Virginia, from 1932 to 1939, inclusive, to his alleged widow, have been introduced in evidence, without the envelopes. in which they were mailed. All the salutations read, "Dear Eva," and all are signed, "Pete." In some of these letters, he speaks of coming "home" and they contain many phrases of endearment, but in none does he address the recipient as his wife or make any reference to being married. He closes six of them with the identical expression, "With all the love in this world for you Dear the only woman I love in this whole world."

The deceased had a certificate of insurance in which he named Eva Goettge as his beneficiary, which is dated April, 1927. This was issued after she was divorced from the deceased and prior to her marriage to George Beddows and prior to the alleged common law marriage in 1930.

The brother of the deceased has introduced in evidence an application for a purchase of a radio with the Godfrey Electric Company, dated November 19, 1936, in which the alleged widow signed her name as "Mrs. Eva Rees". Also on October 21, 1937, she signed a purchaser's statement with Simon P. Mumma, in the same manner. She signed a chattel mortgage with the Citizens Budget Company on November 17, 1936, as "Mrs. Eva Rees."

All of her intangible tax returns for the years 1936 to 1939, inclusive, were signed, "Eva B. Rees," residing at R. D. No. 1, Strasburg, Ohio, and her occupation was given as "farmer".

In several other chattel mortgages she signed her name as "Eva B. Rees."

In a deed which she executed on April 6, 1936, conveying property to Michael L. Kern et, she signed as "Eva Rees," a widow.

When she purchased property on December 3, 1935, from W. H. Wheaton et, she purchased it in the name of "Eva Rees".

In her application for operator's (driver's) license, filed with the Bureau of Motor Vehicles on September 30, 1939, subsequent to the decedent's death, she signed her name as "Eva Rees".

There is nothing in the record to indicate that she ever carried the decedent's name in any of her business transactions where she was required to sign her name, but on the contrary she carried the name of her second husband to whom she was married for a number of years and who is the father of her two children, although she had subsequently been married and divorced twice.

The facts in the instant case are similar to those reported in **Gilmore v Dorning, 31 O. L. R. 558** wherein it was held, "that such a marriage (common law) is not established, where it is claimed that the relation existed for a dozen years or more, but no showing is made of any effort during all that time to establish a home, and there was no living together except on week-ends or at times the occupancy of the same sleeping quarters, but with the alleged wife still bearing her old name, and no holding out to the public of the relations of husband and wife, and their dealings with the public being carried on as though each was entirely independent and no marriage relation existed."

In the case at Bar, no home was established by the parties at the place where the decedent had been employed for many years. He came to the home established by the alleged widow before the present alleged marriage was consummated, on week-ends and when he was not employed. The alleged wife continued to bear the name she had assumed after she was last divorced and did not use the decedent's ▮▮▮▮▮ ▮ name. At least her dealing with the public as shown by her applications for purchases, the giving of chattel mortgages, the making of tax returns, and in the purchase and sale of real estate, etc., show she was acting entirely independent and as no marriage relation existed.

A person who had been married by license on four different occasions certainly would have no valid reason for consummating a common-law marriage. There could be no contention that such a person was innocent of legal requirements. Where innocent persons are not involved, the legal recognition of such a marriage certainly would be against public policy and alien to the customs and ideas of our citizens. It would shock their sense of propriety and decency, and would weaken the public faith in the sanctity of the marriage relations. Especially is this true where the only reason advanced for the sustaining of such a marriage is to establish the right of inheritance.

Under the other circumstances in this case, we must assume that the deceased's action in filing federal and state income tax returns, in which he claimed the exemption of a married person, was a misrepresentation of the facts to escape the payment of taxes.

In the case of **In re Redman, 135 Oh St 554, 14 OO 426, supra,** the court made this observation:

"So-called common law marriages contravene public policy and should never be accorded any favor; indeed, it it quite generally condemned. It is well settled in Ohio that to establish a common law marriage, all the essential elements of such relationship must be shown **by clear and convincing evidence.** Such informal marriages are seldom recognized **and are held valid by courts only to protect the rights of innocent persons.**

Considering all the evidence in this case, including that of the alleged widow, the court concludes that such purported marriage is invalid since there are no rights of innocent persons to be protected, and the only reason advanced to sustain it being to establish the right of inheritance.